# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RMB PROPERTIES, LLC – SERIES I, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 23-10489-MJJ |
| 171 ATLANTIC ROAD LLC, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OF DECISION

April 22, 2026

JOUN, D.J.

This action arises from a contract dispute between the buyer and seller of real property. The buyer, RMB Properties, LLC Series I ("RMB" or "Plaintiff"), asserts four claims against the seller, 171 Atlantic Road LLC ("171 Atlantic" or "Defendant"), seeking to recover damages allegedly resulting from defects in the property and Defendant's failure to remedy them. *See* [Doc. No. 40]. Specifically, Plaintiff alleges breach of contract (Count I), breach of an express warranty (Count II), and breach of the implied warranty of habitability (Count III), and also seeks declaratory relief (Count IV). [*Id.*].

The parties filed cross motions for summary judgment on Counts I–III. For the reasons stated below, RMB's motion for partial summary judgment, [Doc. No. 166], is GRANTED in part and DENIED in part, and 171 Atlantic's first and second motions for partial summary judgment, [Doc. Nos. 137 and 172], are DENIED.

## I.    PROCEDURAL HISTORY

On March 2, 2023, RMB filed a complaint asserting claims for breach of contract and breach of an express warranty, and seeking declaratory relief. [Doc. No. 1]. On October 24, 2023, RMB amended its complaint to add a claim for breach of the implied warranty of habitability. [Doc. No. 40].

On April 16, 2025, 171 Atlantic filed a motion for partial summary judgment. [Doc. No. 137]. The motion does not clearly identify the specific claims on which summary judgment is sought. *See generally* [*id*.]. Construing the motion broadly, however, I interpret it as challenging Plaintiff's contract and warranty claims (Counts I–III). In essence, 171 Atlantic argues that it cannot be held liable, as a matter of law, for damages arising from matters outside the scope of the PSA, which forms the basis of those claims. [*Id*. at 2–3]. On September 4, 2025, I entered an Order permitting the parties to complete expert discovery before ruling on the motion. [Doc. No. 157].

Following the completion of expert discovery, 171 Atlantic filed a second motion for partial summary judgment. [Doc. No. 172]. The motion is intended as a supplement to the first and incorporates additional evidence obtained after the initial motion was filed. [*Id*.]. It does not supersede the first motion; rather, while the initial motion "addresses claimed damages that arise outside of the PSA," the second motion "goes further based on the expert disclosures and depositions that have occurred since the initial [motion for partial summary judgment] was filed." [*Id*. at n.1].

On November 3, 2025, RMB filed a motion for partial summary judgment on Counts I–III on the issue of liability. [Doc. No. 166].

On February 12, 2026, I heard arguments on the motions for summary judgment. [Doc. No. 193].

## II.    BACKGROUND

I summarize the following operative facts which are undisputed unless otherwise noted.[1]

### A.  <u>The Parties</u>

RMB is a limited liability company, and its sole member is The Ronald Berman Revocable Trust. [Doc. No. 40 at ¶ 1]. On September 18, 2020, RMB purchased from 171 Atlantic a newly-renovated $4.7 million property located in Gloucester, Massachusetts ("the Property") to serve as the primary residence for Mr. Ronald Berman ("Berman"). [*Id*. at ¶ 11]; [Doc. No. 137-2 at 1, ¶ 1].

171 Atlantic is also a limited liability company with a sole member. [*Id*. at ¶ 2]; [Doc. No. 43 at ¶ 2]. The member is non-party Bryan Melanson ("B.Melanson"). [Doc. No. 176 at ¶ 4]. B.Melanson is also the sole owner of Melanson Development Group, Inc. ("MDG") [Doc. No. 176 at ¶ 5]. 171 Atlantic engaged MDG to renovate the Property. [*Id*. at ¶ 5]. MDG has been owned by B.Melanson since the 1980s. [Doc. No. 178-2 at 21].

Edward Melanson ("E.Melanson"), who is B.Melanson's brother, was "the project manager of the job, at 171 Atlantic," according to B.Melanson. [Doc. No. 178-2 at 25; B.Melanson Dep. 24:15–22]. At the time of his deposition, B.Melanson said E.Melanson was an employee of

---

[1] In the interest of brevity, this factual background is limited to those facts necessary to frame the parties' cross-motions for summary judgment. Both parties, however, have submitted extensive statements of fact containing numerous paragraphs, many of which are disputed. A substantial number of these disputes concern semantics, characterizations, implications, or the completeness of a fact, and at times devolve into legal argument. I will therefore focus on identifying those disputes that are genuinely material. *See Atain Specialty Ins. Co. v. Davester LLC*, 518 F. Supp. 3d 551, 555 (D. Mass. 2021) ("Disputes over facts that are irrelevant or unnecessary will not preclude summary judgment") (citation omitted). To the extent facts are not properly disputed, they will be deemed admitted. *See Muniz v. RXO Last Mile, Inc.*, 2023 WL 5353749, at *2 (D. Mass. Aug. 21, 2023) (finding responses insufficient where they raise "distinctions without a difference" or "restate[] legal standards to manufacture a dispute"); *Guerrios Flores v. S.M. Med. Servs., C.S.P.*, 2020 WL 1698993, at *2 (D.P.R. Apr. 7, 2020) (responses that fail to contradict the asserted fact are insufficient) (citation omitted). Likewise, purported disputes unsupported by citation to the record will be treated as undisputed. *See* L.R., D. Mass. 56.1 (requiring a statement of material facts with record citations demonstrating a genuine issue for trial).

171 Atlantic. [*Id*. at 24; 23:17–21]. E.Melanson testified in his deposition that 171 Atlantic "did the whole renovation" of the Property. [Doc. No. 178-8 at 26; E.Melanson Dep. 25:7].

### B. The Property

171 Atlantic purchased the Property and the surrounding land in the summer of 2018, [Doc. No. 170-34 at 6; B.Melanson Dep. 27:23–24], "for the sole purpose of renovating it and listing it for sale to the public," [Doc. Nos. 40 and 43 at ¶ 6]. At the time of purchase, the nine-acre parcel included additional structures, including "another big mansion type home" and "multiple smaller structures around the property that were motels." [Doc. No. 170-34 at 8; B.Melanson Dep. 30:9–21]. 171 Atlantic initially planned to subdivide the parcel into multiple lots and considered demolishing all existing structures to construct new ones. [Doc. No. 170-34 at 9; B.Melanson Dep. 36:4–17]. Shortly after the purchase, however, B.Melanson and 171 Atlantic decided to retain the Property itself, noting that the surrounding community attached "sentimental value" to it. [Doc. No. 170-34 at 10; B.Melanson Dep. 37:2–9]. The remaining structures on the parcel were subsequently demolished. [*Id*. at 11; *id*. 38:9].

The Property is a 7,800-square-foot single-family home. [Doc. Nos. 40 and 43 at ¶ 6]. Its original structure was built in 1908. [Doc. No. 170-34 at 11; B.Melanson Dep. 38:22]. At the time of purchase, the Property had been used as a hotel, requiring 171 Atlantic to convert it into a single-family residence. [Doc. No. 170-38 at 4; E.Melanson Dep. 17:2–5]. E.Melanson testified that the conversion involved "gut[ting] the inside down to the studs, bare studs, and start[ing] a whole new build-out," including blueboard, paint, trim, bathrooms, electrical systems, flooring, and kitchens. [*Id*.]. The work also encompassed new heating systems, electrical systems, HVAC, and "everything on the inside up to the face of the studs," as well as exterior components such as the roof, siding, decks, and windows. [*Id*.; *id*. 7–14].

4

E.Melanson testified that, aside from this restoration of the Property, 171 Atlantic had no experience completing restoration of an abandoned building. [Doc. No. 170-38 at 7; E.Melanson Dep. 28:4–7]. He further stated that 171 Atlantic had no experience with oceanside property, [*id*.; *id*. 8–13], or with luxury homes prior to this project, [*id*. at 9; *id*. 30:6–8]. Nevertheless, 171 Atlantic intended for the Property to be a luxury home, which meant, according to E.Melanson's deposition testimony, using "[h]ighest quality of almost everything. Not the absolute pinnacle of highest quality, but very, very good products selected through each phase of the building; appliances, flooring, bathroom fixtures, kitchen fixtures, kitchen cabinets. You know, all products used were to be high-end." [*Id*.; *id*. 9–18].

E.Melanson also testified that 171 Atlantic "tried to preserve the exterior" of the Property and did so "as much as possible," noting that they retained "virtually all the moldings, the overhangs, [and] the eaves." [*Id*. at 11; *id*. 47:11–14]. By contrast, the interior was largely demolished; he stated that they "demoed pretty much everything except for the dining room." [*Id*.; *id*. 16–17]. With respect to the dining room, they "didn't take anything out," but instead painted over the existing features, leaving them in place and "put[ting] a new face on it." [*Id*.; *id*. 20–22]. He also testified that the original beams in the kitchen were left intact. [*Id*.; *id*. 23–24]. Although 171 Atlantic retained an architect to assist with the renovation, [*id*. at 10; *id*. 37:9–17], E.Melanson acknowledged that they did not hire an architect specializing in preservation, explaining that "there wasn't any extra effort involved in preserving what was there." [*Id*. at 12; *id*. 48:10–14]. He further testified that the architects were not consulted before he and the project team installed a coffered ceiling. [*Id*. at 58; *id*. 134:15–17]. On May 25, 2022, architect Andrew advised E.Melanson that the ceiling framing "was not designed to support a new coffered ceiling." [*Id*.; *id*. 1–9].

C. **The Purchase and Sale Agreement ("PSA")**

On September 18, 2020, RMB and 171 Atlantic entered into a PSA under which RMB agreed to purchase the Property. [Doc. No. 147 at ¶ 1]. Section 9 of the PSA, entitled "Possession and Condition of Premises," provides:

> Full possession of said premises free of all tenants and occupants, is to be delivered at the time of the delivery of the deed, said premises to be then (a) in the same condition as they now are, reasonable use and wear thereof excepted, and (b) not in violation of said building and zoning laws or other laws, and (c) in compliance with provisions of any instrument referred to in clause 4 hereof. The BUYER shall be entitled personally to inspect said premises prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause.

[Doc. No. 137-1 at 5].

1. **PSA Rider A: Premise Inspections**

The PSA included several rider provisions, including Rider A, in which RMB agreed that it "has been given full and ample opportunity to inspect the Premises," that, except as otherwise expressly provided, it was accepting the Property in "as is" condition, and that the agreement constituted the parties' complete and integrated understanding with respect to the transaction. [Doc. No. 147 at ¶ 3].

Rider A, Section 7 of the PSA further provides that, "[w]ithin three (3) days of Closing, Buyer and Seller shall inspect the Premises to create, if necessary, a final punchlist (the 'Final Punchlist') of minor items requiring completion and/or repair and/or remediation by Seller." It also reflects that, following its inspections, Buyer had already submitted a preliminary punchlist identifying items to be corrected or completed prior to closing, which was attached as Schedule 7. [Doc. No. 137-1 at 10].

6

### 2.  The Punchlists

The PSA included a Preliminary Punchlist identifying 39 items. [Doc. No. 147 at ¶ 6]. The parties dispute, however, whether that Preliminary Punchlist was intended to be final and thus binding on 171 Atlantic to complete. [Id. at ¶ 7]. The listed items included, *inter alia*:

- "Water seepage at bulkhead"

- "Bulkhead area to be modified"

- "Install missing insulation around lower level windows"

- "Install radon mitigation system"

- "Ensure exterior siding and flashing above window in formal dining room have no active leaks; repair [] damage"

[Doc. No. 137-1 at 17].

As provided in Rider A, the Parties also created a Final Punchlist. *See* [Doc. No. 170-38 at 20; E.Melanson Dep. 62:8–24]; *see also* [Doc. No. 146-4 at 2–3]. The items set forth in the Final Punchlist would be fixed at Defendant's sole expense. [Doc. No. 40-1; PSA Rider A ¶ 7].

### 3.  PSA Rider C: Seller's Limited Warranty

The PSA also provided a "Seller's Limited Warranty" at Rider C. [Doc. No. 147 at ¶ 8]. The second and third paragraphs of the Seller's Limited Warranty state:

> THIS LIMITED WARRANTY SPECIFICALLY EXCLUDES ANY CONSEQUENTIAL AND INCIDENTAL DAMAGES AND IS LIMITED ONLY TO DWELLING REPAIRS. THERE ARE LIMITATIONS IN THE DURATION OF WARRANTIES. THERE ARE NO IMPLIED WARRANTIES WHATSOEVER.

> NOTWITHSTANDING THE FOREGOING OR ANYTHING TO THE CONTRARY CONTAINED IN THIS SELLER'S LIMITED WARRANTY, SELLER HEREBY DOES NOT DISCLAIM, NOR DOES BUYER IN ANY MANNER, WHETHER BY IMPLICATION OR OTHERWISE, WAIVE THE IMPLIED WARRANTY OF HABITABILITY AS PROVIDED UNDER MASSACHUSETTS LAWS AND DECISIONS.

[Doc. No. 137-1 at 13].

Section 10 of Rider C of the PSA, entitled "Exclusion from Coverages," states that 171 Atlantic "specifically do[es] not assume responsibility for any of the following items, each of which is specifically excluded from this Limited Warranty." [Doc. No. 137-1 at 14]. This section then lists items excluded from the Seller's Limited Warranty, including, *inter alia*:

- "Defects which are the results of characteristics common to materials used such as, but not limited to warping or deflection of wood, …"

- "Defects in items installed furnished or installed by you or anyone other than by us or our subcontractors at our order."

- "Loss or injury due to the elements, including, without limiting the generality of the foregoing, freeze ups in the plumbing system caused by lack of heat."

- "Consequential or incidental damages."

 [*Id*.].

### 4.  Remedies

The PSA sets forth the remedies available in the event of a breach by 171 Atlantic. [Doc. No. 150-1 at 2]. It provides that "[i]f the Seller shall fail to fulfill the Seller's agreements herein contained, in addition to all other rights and/or remedies available at law or equity to Buyer by reason of such default, Buyer may elect to seek specific performance of this Agreement." [Doc. No. 137-1 at 6].

### 5.  Property Inspection

Before closing, Berman retained Strout Inspections to inspect the Property. [Doc. No. 170-4 at 2]; *see also* [Doc. No. 176 at 10, ¶¶ 29–30]. The Inspection Agreement provided for "a general evaluation of the home, consistent with the standards and practice of MA CMR 266." [*Id*.]. The inspectors expressly disclaimed certain areas, including "inspection of water … [or] radon," and further stated that they "do not assess building code compliance or repairs needed to bring [the

Property] into compliance." [*Id*.]. The inspection itself was limited to a visual review of accessible areas of the Property on the date it was conducted. [Doc. No. 176 at 10, ¶ 30].

### 6. Alleged Defects with the Property

#### a. Pre-Litigation Communications

After execution of the PSA, Berman exchanged letters with B.Melanson and E.Melanson regarding ongoing issues with the Property. [Doc. No. 54-1]; [Doc. No. 176 at 45, ¶¶ 105–106]. In those communications, Berman identified numerous concerns, including: water ponding near the front entrance that damaged floors and drywall; water cascading into the entrance during rain; gutters that failed to divert water away from the home; leaks in third-floor windows; buckling and cupping of wood flooring near affected areas; water damage to the first-floor ceiling caused by leaks from a second-floor shower; water damage to drywall from roof, window, and drain leaks; the absence of a sump pump in the elevator pit; ductwork that did not comply with the building code; exposed exterior wiring; a missing sump pump cover in the basement; mold growth due to water intrusion; a fire hazard from faced-fiberglass insulation; leftover Crack-X injection ports; and continued leakage at the bulkhead. [*Id*.]; [*Id*. at 46–51, ¶ 107].

Over the course of at least nine months, Berman also exchanged numerous text messages with E.Melanson concerning these issues. *See* [Doc. No. 170-6; Plaintiff's Ex. 6]. During this same period—spanning November 2020 through August 2021—Berman repeatedly reported water intrusion issues. [*Id*. at 5–31].

#### b. Radon

Punchlist Item No. 22 required 171 Atlantic to "[i]nstall [a] radon mitigation system." [Doc. No. 176 at 42, ¶ 97]. Radon is a radioactive, cancer-causing gas, and the U.S. Environmental

Protection Agency recommends remediation when indoor radon levels reach 4 picocuries per liter or higher. [*Id.* at 43, ¶¶ 99–100]. Rider A to the PSA further provides, in relevant part:

> "Notwithstanding the foregoing, pursuant to the results of an inspection report provided to and for BUYER that indicate that the presence of radon that is higher than 3.9 pc/l, the SELLER shall correct this radon problem by mitigation (installation of a so-called 'radon mitigation/ventilation system' ('System') to bring the presence of radon on the Premises below than [sic] 3.9 pc/l) performed by a professional in the industry (subject to any applicable building code requirements and/or design constraints). SELLER shall provide BUYER with a Certification that mitigation has been accomplished (evidenced by test results), this shall be done at the SELLER's sole and exclusive expense."

[Doc. No. 176 at 42, ¶ 97; Rider A ¶ 8].

E.Melanson testified that he was aware of the radon mitigation issues at the Property. [Doc. No. 170-38 at 54; E.Melanson Dep. 121:10–12]. On November 11, 2020, he informed Berman that the radon re-test results were "slightly high," reporting an average of 7.0 and a current reading of 8.2, though the proposed fix "should do the trick." [Doc. No. 176 at 43, ¶ 101]. That fix did not do the trick, and the radon issue remained unresolved. According to Berman, as of May 29, 2025, the radon levels remained "extremely high." [Doc. No. 170-35 at 27; Berman Dep. 428:20–22]. E.Melanson further testified that the subcontractor responsible for radon mitigation was unable to reduce the levels to 4.0 despite repeated efforts, ultimately concluding, "This is the best I can do." [Doc. No. 170-38 at 54; E. Melanson Dep. 121:15–21].

### c.    Water Intrusions

Berman testified that the water intrusion issues at the Property significantly impaired his ability to live there. [Doc. No. 170-35 at 4; Berman Dep. 26:2]. He explained that "there was a significant amount of water coming into our home," such that "we couldn't live in it." [*Id.* at 4–5; *id.* 25:24, 26:1–2]. He further testified that although conditions were initially acceptable when they moved in during September 2020, the situation deteriorated in the winter, when water began

10

entering through the windows and basement, rendering the home uninhabitable. [*Id*. at 5; *id*. 26:4–8]. He added that his daughter and her family would leave in the middle of the night because they could not tolerate the conditions. [*Id*.; *id*. 2–11].

## III.  STANDARD OF REVIEW

Summary judgment is appropriate where the record shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if it "must be decided at trial because the evidence. . .  would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a motion for summary judgment, courts must consider the record and draw all reasonable inferences in favor of the nonmoving party, but they need not credit "conclusory allegations, improbable inferences, and unsupported speculation." *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023) (quoting *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The court may review all materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, and other evidence. Fed. R. Civ. P. 56(c); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). Although the court is required to consider the cited materials, it may also consider other parts of the record as appropriate. *See Asociación de Periodistas de Puerto Rico v. Mueller*, 680 F.3d 70, 78 n.6 (1st Cir. 2012) (citing Fed. R. Civ. P. 56(c)).

## IV.  DISCUSSION

I begin with Plaintiff's motion for summary judgment on breach of contract (Count I), breach of an express warranty (Count II), and breach of the implied warranty of habitability (Count III).

### A. <u>Breach of Contract</u>

Under Massachusetts law, a plaintiff asserting a breach of contract claim must establish that (1) a valid contract existed between the parties, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant breached the contract, and (4) the plaintiff suffered damages as a result. *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013) (citing *Singarella v. City of Boston*, 342 Mass. 385 (1961)); *see also JLB LLC v. Egger*, 462 F. Supp. 3d 68, 86 (D. Mass. 2020). Here, the parties do not dispute the first two elements. *See* [Doc. No. 176 at 13, ¶ 37]. Their disagreement centers on the third and fourth elements—whether Defendant breached the contract and caused damages as a result—which is the focus of this motion. Accordingly, the analysis is confined to these issues.

First, Defendant breached the PSA by failing to fix certain items enumerated in the punchlists. *See* [Doc. No. 147 at ¶ 6]. It is undisputed that defects requiring repair included "[w]ater seepage at bulkhead," "[r]epair lead flashing chimney front of house left side," "[l]oom and seed grade at bottom of right-hand deck stairs by bulkhead," "[i]nstall radon mitigation system," and "[b]ulkhead area to be modified." [Doc. No. 176 at 12]. Rider A to the PSA required that the Preliminary Punchlist items be completed prior to closing, with any remaining items to be addressed through a Final Punchlist at Defendant's sole expense. *See* [Doc. No. 40-1; PSA Rider A ¶ 7]. The record reflects, however, that Defendant failed to correct several of these items. Specifically, Defendant did not fix the "[w]ater seepage at the bulkhead" or the "[l]oom[ing] and grad[ing] at the bottom right hand deck stairs by the bulkhead," [Doc. No. 170-38 at 42; E.Melanson Dep. 104:6–8], nor did it successfully "[r]epair lead flashing chimney front of house left side," [*id*. at 44; *id*. 109:1–12], or "[s]eal joints between wood siding, shingles and stone column and exterior trim," [*id*. at 35; *id*. 86:1–23].

12

Defendant contends that its failure to complete the Preliminary Punchlist items "prior to closing," as referenced in Rider A, means "those items were deemed fully performed and discharged." [Doc. No. 175 at 6]. That interpretation is inconsistent with other provisions of Rider A, including the requirement that Final Punchlist items be completed "by Seller at its sole cost and expense." [Doc. No. 40-1 at 8]. It is also at odds with E.Melanson's own testimony regarding the Punchlists. In his deposition, E.Melanson stated that "[171 Atlantic] had agreed to attempt to have [the Preliminary Punchlist] done by the time of closing." [Doc. No. 170-38 at 19; E.Melanson Dep. 61:22–23]. Defendant cannot, however, avoid its contractual obligations simply by failing to complete those items before closing. The record reflects this understanding. E.Melanson further testified that, although he did not recall providing Berman with a specific post-closing timeline for completing the Punchlist items, he believed that each time work was performed at the Property it "would be the end of it," though "obviously that was not the case." [*Id*. at 24; *id*. 66:5–7].

Defendant also asserts that a factual dispute exists as to whether a Final Punchlist was ever created. The record does not support that claim. The evidence, including E.Melanson's deposition testimony, demonstrates that the parties did, in fact, generate a Final Punchlist. *See* [Doc. No. 170-38 at 20; E. Melanson Dep. 62:8–24]; *see also* [Doc. No. 146-4 at 2–3]. Defendant ultimately failed to fulfill its obligations to complete the Punchlist repairs.

The undisputed evidence demonstrates that the following Punchlist items were not completed, thereby constituting a breach of contract:

- No. 2: "Water seepage at bulkhead" *See* [Doc. No. 170-38 at 33; E.Melanson Dep. 84:4–13]; *see also* [Doc. No. 170-11 at 3 (E.Melanson on Sept. 14, 2021: "The most notable issue [we are still dealing with] is the leaking in the bulkhead area.")].

- No. 5: "Repair lead flashing chimney front of house left side" *See* [Doc. No. 170-38 at 44–48; E.Melanson Dep. 109–113].

- No. 11: "Loom and seed Grade at bottom of right hand deck stairs by bulkhead" *See* [Doc. No. 170-38 at 42; E.Melanson Dep. 104:1–8]; *see also* [Doc. No. 170-11 at 3 (E.Melanson on Sept. 14, 2021: "We believe that [the leaking in the bulkhead area] can and will be remedied by creating a positive pitch away from the foundation.")].

- No. 20: "Seal joints between wood siding shingles and Stone columns and exterior trim" *See* [Doc. No. 170-38 at 34, 36; E.Melanson Dep. 85:4–24, 88:2–23]; *see also* [Doc. No. 176 at 56–57, ¶ 120].

- No. 22: "Install radon mitigation system" *See* [Doc. No. 170-38 at 54; E.Melanson Dep. 121:10–24].

- No. 24: "Bulkhead area to be modified" *See* [Doc. No. 170-38 at 26; E.Melanson Dep. 69:16–23]; *see also* [Doc. No. 170-11 at 3 (E.Melanson on Sept. 14, 2021: "The most notable issue [we are still dealing with] is the leaking in the bulkhead area.")].

Plaintiff also contends that Defendant breached the PSA by failing to deliver the Property in compliance with the Massachusetts Building Code ("MBC"). *See* [Doc. No. 167 at 19–20]. Paragraph 9 of the PSA provides that possession of the Property "is to be delivered at the time of the delivery of the deed . . . not in violation of said building and zoning laws or other laws." [Doc. No. 137-1 at 5]. Plaintiff asserts that the Property violated the following provisions of the MBC:

- MBC § R703.1.1 ("requires the exterior wall envelope of a building to be built in a way that 'prevents the accumulation of water within the wall assembly' by featuring both (i) a 'water-resistant barrier behind the exterior veneer'; and (ii) a means for water that enters the wall assembly to drain to the exterior of the Property.")

- MBC § R.703.1 ("states that '[e]xterior walls shall provide the building with a weather-resistant exterior wall envelope.'")

- MBC § R703.4 ("states that '[a]pproved corrosion-resistant flashing shall be applied shingle-fashion in a manner to prevent entry of water into the wall cavity or penetration of water to the building structural framing components.'")

- MBC § R703.6.1 ("stating that the 'offset spacing between joints in adjacent courses' for wood shingles 'shall not be less than 1 ½ inches (38 mm).'")

- MBC § R302.10.1 ("states '[i]nsulation materials, including facing, such as vapor retarders and vaporpermeable membranes installed within floor-ceiling assemblies, roof-ceiling assemblies, wall assemblies, crawl spaces and *attics* shall have a flame spread index not to exceed 25 with an accompanying smoke-developed index not to exceed 450 where tested in accordance with ASTM E84 or UL 723.'")

14

- MBC § R401.3 ("requires '[s]urface drainage shall be diverted to a storm sewer conveyance or other approved point of collection that does not create a hazard,' as well as that a lot must 'be graded to drain surface water away from foundation walls.'")

- MBC § R316.4 ("states that, '[u]nless otherwise allowed in Section R316.5, foam plastic shall be separated from the interior of a building by an *approved* thermal barrier of not less than ½-inch (12.7 mm) gypsum wallboard, 23/32-inch (18.2 mm) wood structural panel or a material that is tested in accordance with and meets the acceptance criteria of both the Temperature Transmission Fire Test and the Integrity Fire Test of NFPA 275.'")

[Doc. No. 167 at 20–22].

Defendant does not address these allegations in its opposition to Plaintiff's motion for partial summary judgment. *See* [Doc. No. 175]. Indeed, the memorandum contains no discussion of the MBC. [*Id.*]. Although Defendant purports to "incorporate[] herein by reference its Response to Plaintiff's Statement of Material Facts and its Additional Statement of Material Facts," [*id.* at 2], those materials do not create a genuine dispute. Defendant's additional statement of material facts asserts, in conclusory fashion, that "[t]here are no known violations of building or zoning laws," relying solely on the e-permit Certificate of Occupancy. [Doc. No. 177 at 3, ¶ 209]; [Doc. No. 178-10]. The same unsupported assertion appears in Defendant's response to Plaintiff's statement of material facts. *See* [Doc. No. 176 at 13, ¶ 39]. Such conclusory statements are insufficient to create a genuine issue of fact. *See Dixon-Tribou*, 86 F.4th at 458 (courts need not credit "conclusory allegations").

Plaintiff contends that Defendant breached the PSA by failing to install a radon mitigation system capable of reducing radon levels to the contractually required threshold. *See* [Doc. No. 176 at 42, ¶ 97; Rider A ¶ 8]. Rider A specifies that radon levels must be below 3.9 pc/l. [*Id.*]. Testing conducted in November 2020 revealed radon levels of 8.2 pc/l, with an average of 7.0 pc/l —well above the agreed-upon limit. [Doc. No. 170-6 at 2]. E.Melanson, 171 Atlantic's project manager, testified that 171 Atlantic was aware of these elevated levels after Berman moved into the Property

15

but was unable to successfully install the required mitigation system identified in the Punchlist. [Doc. No. 170-38 at 54; E.Melanson Dep. 121:15–21]. These undisputed facts establish that Defendant failed to satisfy its contractual obligation, constituting a breach of the PSA.[2]

Plaintiff suffered damages because of Defendant's breach. *See, e.g.*, [Doc. No. 170-35 at 13; Berman Dep. 245:11–16 ("We had spent enormous amounts of money, . . . months and months of construction, and fixing and fixing. . .")]; [Doc. No. 176 at 60–61, ¶ 131 (Defendant's expert acknowledged stone masonry flaws resulting in water intrusions, and the only dispute was cost and type of remediation work needed)].

Plaintiff's motion for partial summary judgment on liability for the breach of contract claim (Count I) is GRANTED.

## B. Breach of Express Warranty

In a breach of express warranty claim, "the standard of performance is set by defendant's express promises to the plaintiff, [so] 'the plaintiff must demonstrate that the defendant promised a specific result' and that defendant failed to deliver on his promise and, therefore, breached the express warranty." *Jackson v. Johnson & Johnson and Janssen Pharmaceuticals, Inc.*, 330 F. Supp. 3d 616, 627 (D. Mass. 2018). *See also Cristostomo v. New Balance Athletics, Inc.*, 647 F. Supp. 3d 1, 12 (D. Mass. 2022). "The plaintiff must also demonstrate that the express warranty constituted the basis of the bargain between the seller and the buyer," and to do so, a buyer must demonstrate that it relied on the warranty. *Cristostomo*, 647 F. Supp. 3d at 12. In essence, a breach of express warranty claim rests on the principle that "defendants are liable to the plaintiff for failure

---

[2] Defendant does not dispute that the reported radon levels exceed those permitted by the agreement, but instead contends that the testing process at the Property was flawed. [Doc. No. 175 at 2]. The record, however, reflects that Defendant raised no concerns about the testing location at the time. *See* [Doc. No. 170-6 at 2]. Had Defendant believed the testing to be improper, it should have raised that issue then, not now. This belated challenge does not create a genuine dispute of material fact, and no such dispute exists as to Defendant's breach of the agreement with respect to radon levels at the Property.

to provide … a standard of performance allegedly promised." *Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc.*, 396 Mass. 818, 822 (1986).

The PSA, through Rider C, included a Seller's Limited Warranty effective for one year from the date of possession. [Doc. No. 137-1 at 13–15; Rider C]. Berman testified that, in reviewing the contract, he understood that "the builder was giving [him] a warranty." [Doc. No. 170-35 at 6; Berman Dep. 124:1–7]. In opposing Plaintiff's motion, Defendant addressed only alleged breaches relating to leaks in the master bedroom and issues with roof shingles and roof leaks. [Doc. No. 175 at 15–16]. Plaintiff, however, also alleges that leaking water caused water damage at the door, leading to curling of the hardwood flooring. [Doc. No. 167 at 24]. The Seller's Limited Warranty expressly covers flooring defects such as "swelling and buckling," [Doc. No. 137-1 at 14, ¶ 8], and thus encompasses this claim. Defendant does not meaningfully respond to this argument. *See* [Doc. No. 175]. Its additional statement of material facts and responses likewise fail to create a genuine dispute, offering only a conclusory assertion that the allegations are not "correct or valid." [Doc. No. 176 at 46, ¶ 107(c)]. Such conclusory denials are insufficient. Accordingly, I find that Defendant breached the express warranty as it relates to the flooring.

Plaintiff further contends that Defendant breached the Seller's Limited Warranty with respect to the plumbing. The warranty provides that "[t]he operation of plumbing and sewerage disposal systems is warranted for a period of one (1) year from the date of the closing." [Doc. No. 137-1 at 14, ¶ 6]. Plaintiff raised plumbing-related concerns in July and August 2021—within one year of the Property's sale. [Doc. No. 167 at 23]; [Doc. No. 176 at 23–28, ¶ 70]. The record reflects numerous instances in which Berman reported water-related issues to E.Melanson, including that the "shower was still leaking to the downstairs," that there were "multiple water issues" affecting the basement, master bathroom, and living room/kitchen, and that there was "another leak in the

ceiling." [*Id.*]. Plaintiff asserts that these plumbing issues were not remedied by Defendant and were ultimately addressed only after Plaintiff retained a separate, outside contractor. *See* [Doc. No. 167 at 23].

Defendant does not dispute the existence of water leaks within the Property. Instead, it relies on expert opinions addressing the source or path of the leaks. *See* [Doc. No. 175 at 15]; *see also* [Doc. No. 178-13]. That response misses the mark. The Seller's Limited Warranty applies to the plumbing system as a whole, not just to plumbing in a particular area, such as the master bathroom. Damages are not presently at issue, and the precise origin of the leaks may become relevant later. For present purposes, however, Plaintiff has submitted sufficient, unrebutted evidence establishing that Defendant breached its express warranty covering the Property's plumbing system.

Finally, Plaintiff asserts that Defendant breached the Seller's Limited Warranty with respect to the roof. The warranty provides that "[t]he Seller warrants against leaking roofs by reason of defects in material or workmanship for a period of one (1) year from the date of possession." [Doc. No. 137-1 at 13, ¶ 2]. In support, Plaintiff relies on observations made in July 2023. [Doc. No. 176 at 75, ¶¶ 162–68]. Those observations, however, occurred after the one-year warranty period had expired. Although Plaintiff contends that conditions such as "exposed nail heads at apron locations" and "improper lappage" may have existed during the warranty period or since construction, [Doc. No. 167 at 24], Defendant disputes those assertions. *See* [Doc. No. 176 at 75, ¶¶ 162–68]. Given this, a genuine issue of material fact exists as to whether Defendant breached the express warranty with respect to the roof.

For these reasons, Plaintiff's motion for partial summary judgment on the breach of express warranty claim is GRANTED in part and DENIED in part.

C. **Implied Warranty of Habitability**

The parties do not dispute the existence or validity of the PSA, nor do they dispute that Massachusetts recognizes an implied warranty of habitability. Plaintiff seeks recovery under that theory, [Doc. No. 40, Count III], while Defendant contends it does not apply. Specifically, Defendant argues that "the Property is not a 'new house' as required by the elements of the Implied Warranty of Habitability," and, alternatively, that "there are genuine issues of material fact as to whether 171 Atlantic breached the Implied Warranty of Habitability." [Doc. No. 175 at 14]. For the reasons set forth below, I disagree with Defendant.

"To establish a breach of the implied warranty of habitability a plaintiff will have to demonstrate that (1) he purchased a new house from the defendant-builder-vendor; (2) the house contained a latent defect; (3) the defect manifested itself only after its purchase; (4) the defect was caused by the builder's improper design, material, or workmanship; and (5) the defect created a substantial question of safety or made the house unfit for human habitation." *Albrecht v. Clifford*, 436 Mass. 706, 712–13 (Mass. 2002). Further, "[w]hile the scope of this warranty must be left largely to case-by-case determination, a home that is unsafe because it deviates from fundamental aspects of the applicable building codes, or is structurally unsound, or fails to keep out the elements because of defects of construction, would breach the implied warranty we adopt today." *Id*. The implied warranty of habitability "cannot be waived or disclaimed, because to permit the disclaimer of a warranty protecting a purchaser from the consequences of latent defects would defeat the very purpose of the warranty." *Id*. at 711.

In Massachusetts, the implied warranty of habitability is grounded in principles of fairness. "Significant to the policy that imposes an implied warranty of habitability on the builder is that the burden be placed on the party who is in the best position to observe and correct the defect during

19

the construction process, before it is hidden beneath finished surfaces." *Berish v. Bornstein*, 71 Mass. App. Ct. 1101, No. 06-P-1404, 2007 WL 4563493 (Dec. 28, 2007) at *4 (citing *Albrecht*, 436 Mass. at 710). Indeed, "fairness dictates that the burden on the [home] owner[]. . . should be limited to observation of materials and components that were 'readily accessible,' without the need to dig and probe beneath finished surfaces in the common areas to uncover shoddy workmanship." *Id*. (quoting *id*. at 713). In *Berish*, the Massachusetts Appeals Court found that the lack of window flashing in a condominium unit, only discovered by the buyer "many months after construction was completed and only when the onset of colder weather caused a noticeable draft to the unit's occupant," classified as a latent defect within the implied warranty of habitability's definition. *Id*.

Courts have defined "latent defect" and "defendant-builder-vendor" within the implied warranty of habitability. The *Albrecht* court defined latent defects as "conditions that are hidden or concealed, and are not discoverable by reasonable and customary observation or inspection." *Id*. at 713 (citing Black's Law Dictionary 429, 887 (7th ed. 1999)). "Although Massachusetts law does not expressly define 'builder-vendor,' persons considered 'builder-vendors' under our implied warranty of habitability jurisprudence have included builders of new residential condominium developments and homes." *Sullivan v. Five Acres Realty Trust*, 487 Mass. 64, 71 (Mass. 2021) (citing *Berish v. Bornstein*, 437 Mass. 252, 254–55 (Mass. 2002)). "In determining whether a party is a builder-vendor for purposes of the implied warranty of habitability, other jurisdictions have focused on whether the house was 'built for the purpose of sale to the public,' *Mobley v. Copeland*, 828 S.W.2d 717, 728 (Mo. Ct. App. 1992), and relatedly, whether the sale was commercial in nature, rather than personal or casual, *see*, *e.g.*, *Mazurek v. Nielsen*, 42 Colo. App. 386, 388 (Colo. App. 1979), *Bolkum v. Staab*, 346 A.2d 210, 211 (Vt. 1975). When a builder-vendor contracts out to a sub-developer who completes the construction, that does not

negate the builder-vendor's status as a builder-vendor under this definition. *See Degnan v. Executive Homes*, *Inc.*, 215 Mont. 162, 168 (Mont. 1985).

With these principles in mind, I turn to the facts, viewed in the light most favorable to 171 Atlantic. E.Melanson, an employee of 171 Atlantic and the project manager for the Property during its construction and renovation, testified at his deposition that, to convert the Property from hotel to residence, they "gutted the inside down to the studs, bare studs, and started a whole new build-out." [Doc. No. 170-38 at 4; E.Melanson Dep. 17:2–8]. This work included new "bathrooms, electrical, flooring, kitchens, . . . everything on the inside up to the face of the studs," as well as "exterior roof, siding, decks, [and] windows." [*Id*.; *id*. 17:9–14]. In addition, Defendant purchased the Property "for the sole purpose of renovating it and listing it for sale to the public." [Doc. Nos. 40 and 43 at ¶ 6]. Thus, by Defendant's own account, the Property was not simply renovated, and the purchase was not personal or casual; rather, the Property was effectively rebuilt for commercial resale to the public, rendering Defendant a builder-vendor for purposes of the implied warranty of habitability.

Defendant's decision to contract with MDG does not negate its status as a builder-vendor for purposes of the implied warranty of habitability. In *Degnan v. Executive Homes, Inc.*, the Supreme Court of Montana rejected a similar attempt to distinguish between a developer and its subcontractor as "a mere technicality" in light of their "interrelationship." 215 Mont. at 168. Although that case addressed whether a subcontractor could be deemed a builder-vendor, the same reasoning applies here in evaluating Defendant's status. Defendant purchased the Property, oversaw its demolition and reconstruction, and provided testimony regarding the materials and work used in the build. *See, e.g.*, [Doc. No. 176 at 9]. That Defendant engaged MDG—an entity owned by the same principal as 171 Atlantic—to perform the construction work does not alter this

analysis. Accordingly, Defendant remains a builder-vendor for purposes of the implied warranty of habitability.

The water infiltration through the doors, ceilings, and windows constituted latent defects that manifested only after the purchase. Defendant asserts in its statement of additional material facts that "Plaintiff was aware of claimed water infiltration prior to its purchase of the Premises," [Doc. No. 177 at 7, ¶ 251], citing [Doc. No. 40-1, PSA cl. 25(f)]. That provision states: "With the exception of minor leakage around bulkhead on the Premises for which BUYER is aware of through their previous inspection, Seller is not aware of any leakage or flooding in the basement, roof, windows or doors or chimneys." Although both parties were aware of the limited bulkhead leakage, the PSA expressly represents that Defendant had no knowledge of any other leakage. The additional water infiltration issues arose only after execution of the PSA, supporting Plaintiff's position that these were latent defects.

On November 30, 2020, Berman texted E.Melanson: "We've got water coming on [sic] the front door." [Doc. No. 176 at 23–28, ¶ 70; Plaintiff's Exhibit 6: Text Chain between E.Melanson and Berman]. E.Melanson responded: "I'll be right over." [*Id*.]. Approximately five hours later, Berman reported additional issues: "Another leak in the ceiling. Plus, the southeast corner is wet and some air coming through. Wet areas are darker. Just found another one on the 2nd floor on the east side door. Lots of other leak areas as seen in shared iCloud file. Also, drafty areas around stone column areas." [*Id*.]. On December 4, 2020, E.Melanson informed Berman that a mason would "start sealing the outside stone." [*Id*.]. On January 18, 2021, Berman again reported water intrusion, stating: "The area near the stairs had water coming through, so looks like it's not just because the woodwork needs to be affixed better. Also, we got water under the front door in about a 12 inch or so area from the hinges toward the other side of the door." [*Id*.]. The reports continued.

On February 16, 2021, Berman noted additional water in the basement. [*Id.*]. On July 2, 2021, he informed E.Melanson that he "had some water come in through the ceiling in the kitchen area. We put a bucket there." [*Id.*]. On July 6, 2021, Berman reported: "We have multiple water issues. Basement, master bathroom and living room/kitchen." [*Id.*]. Finally, on August 24, 2021, Berman stated that the "shower was still leaking to the downstairs" and requested a plan to address the wood floors, along with a walk-through before the Seller's Limited Warranty expired. [*Id.*].

The defects causing these water intrusions were latent because they were neither readily observable nor discoverable through reasonable and customary inspection. The text exchanges between Berman and E.Melanson, summarized above, underscore this point: over the course of at least ten months, they repeatedly attempted to identify the source of the water without success. The cause of the leaks was not visible, as it was concealed behind woodwork, stone, piping, or similar structural components. In *Berish*, the Massachusetts Appeals Court observed that a purchaser's discovery of defective windows only after colder weather arrived "confirm[ed] [their] latent character." 71 Mass. App. Ct. 1101, No. 06-P-1404, 2007 WL 4563493, at *4 (Dec. 28, 2007). The same reasoning applies here, where certain leaks became apparent during storm conditions. The *Berish* court further noted that "digging beneath finished surfaces" is inconsistent with the type of readily observable defects referenced by the Supreme Judicial Court in *Albrecht v. Clifford*, 436 Mass. 706, 713. Here, Berman could not identify the water intrusion issues until they manifested, which occurred after he had taken possession and moved into the Property. Even then, the precise cause of the leaks remained unclear, as reflected in E.Melanson's ongoing, years-long efforts to diagnose and remedy the problem. Accordingly, these defects qualify as latent within the meaning of the implied warranty of habitability, as they became apparent only after purchase and occupancy.

Although the precise cause of the pervasive water intrusions remains unclear, the record supports the conclusion that they stem from deficiencies in the builder's design, materials, or workmanship. Defendant undertook a complete build-out of the Property, beginning from "bare studs" and installing flooring, plumbing, electrical systems, bathrooms, as well as the exterior roof, siding, and windows. [Doc. No. 170-38 at 4]. If these components had been properly designed and constructed, as in a soundly built home, water would not have infiltrated through ceilings, windows, doors, and tubs. On this record, that inference is both reasonable and sufficient without delving further into disputed details of material fact.

Finally, although habitability is a fact-specific inquiry, the Supreme Judicial Court in *Albrecht* explained that "a home that is unsafe because it deviates from fundamental aspects of the applicable building codes, or is structurally unsound, or fails to keep out the elements because of defects of construction, would breach the implied warranty we adopt." 436 Mass. at 712–13. Here, I have already determined that Defendant is liable for violations of the MBC. *See* Sec. IV.A., *supra*. In addition, the record demonstrates that the Property failed to keep out the elements. Berman testified that "it started to rain and water started pouring in through the porch area in front of the house." [Doc. No. 170-35 at 10; Berman Dep. 204:4–5]. He further testified that they "couldn't live in [the house]," explaining that although the weather was initially fair when they moved in, "[i]n the winter of 2020 we were getting water in through the windows and through the basement, and our house was inhabitable [sic]. My daughter and her family just would leave in the middle of the night because they couldn't handle it." [*Id*. at 4; *id*. 26:2–11]. These facts fall squarely within the circumstances the Supreme Judicial Court identified as constituting a breach of the implied warranty of habitability.

24

Based on the record, I find that Defendant breached the implied warranty of habitability, and RMB's motion for partial summary judgment on Count III is GRANTED.

### D. Defendant's First Partial Motion for Summary Judgment

As a threshold matter, I first clarify the scope of Defendant's motion. Defendant contends that it "cannot be held liable for: A) claimed damages relating to new construction outside of the purchased premises as defined in the PSA, including but not limited to construction of a pool, garage, and studio; B) claimed damages relating to remediation of certain areas of the premises outside of the agreed upon punchlist, section 9, or Limited Warranty of the PSA; C) claimed damages that amount to betterments of certain areas of the premises outside of the PSA; and D) claimed damages relating to the retention of consultants and experts." [Doc. No. 137-3 at 1]. I address each argument in turn.

First, Defendant argues that Plaintiff should be precluded from seeking "damages for the addition of a pool, garage, and studio at the Premises" because such construction was neither contemplated by the PSA nor "in the contemplation of the parties" at the time the PSA was executed. [Doc. No. 137-3 at 7–8]. This request is moot. Plaintiff no longer seeks those categories of damages, having withdrawn claims for Architect Redesign Fees for the Pool/Garage/Studio Addition, Pool/Garage/Studio Escalation, and related architectural fees. [Doc. No. 196]; *see also* [Doc. No. 185 at 18 n.5]. A review of Plaintiff's damages summary as of February 2026 confirms that no damages are sought for new construction outside the purchased premises. [Doc. No. 195 at 9–10]. Accordingly, subsection (A) is DENIED as moot.

Next, Defendant contends that because Plaintiff "cite[d] the Punchlist, Section 9 [of the PSA], and the [Seller's] Limited Warranty of the PSA as the basis for Plaintiff's breach of contract and breach of warranty claims," Plaintiff should be precluded from recovering damages beyond

that scope. [Doc. No. 137-3 at 8]. In support, Defendant points to Plaintiff's second supplemental disclosures, [Doc. No. 172-5], and argues that certain claimed damages fall "clearly outside the scope of the Punchlist, Section 9, and/or the Limited Warranty." [Doc. No. 137-3 at 8]. Defendant specifically identifies items such as replacement of the deck metal panel system, window and door MDF trim, crown and coffered ceiling MDF trim, baseboard MDF trim, cottage paneling and trim, and other unspecified remediation work in the first-floor great room as "beyond those damages which are causally connected to an alleged breach." [*Id*.]. Plaintiff has since narrowed its claims. In its notice of damages adjustment, filed February 16, 2026, Plaintiff withdrew its requests for damages relating to replacement of window and door MDF trim, crown and coffered ceiling MDF trim, baseboard MDF trim, and MDF cottage paneling and trim. [Doc. No. 196 at 1]. Following that adjustment, the remaining disputed items under this argument are the replacement of the deck metal panel system and the first-floor great room workmanship damages. [Doc. No. 195 at 10].

Defendant argues that these damages must be excluded because "Plaintiff executed the PSA following his own inspection and failed to identify [them]." [Doc. No. 137-3 at 8]. Plaintiff responds that the deck metal panel remediation "was done to prevent water seepage, including at the bulkhead." [Doc. No. 145 at 9]. More specifically, Plaintiff asserts that Defendant installed metal pans beneath the veranda that directed water toward the Property and, when those panels overflowed, caused additional water intrusion into the basement. [*Id*.]. Plaintiff further contends that this work falls within the Preliminary Punchlist at item number 2, [*id*. at n.4], which includes "[w]ater seepage at bulkhead," [Doc. No. 137-1 at 17]. With respect to the first-floor great room, Plaintiff argues that the sagging ceiling reflects a structural defect implicating life-safety concerns and therefore falls within the implied warranty of habitability. [Doc. No. 145 at 8]. Plaintiff also points to communications from the project architect advising Defendant that the coffered ceiling

design was not structurally advisable. *See* Sec. II, B., *supra*. In light of this record, a genuine dispute of material fact exists as to the deck panel and great room remediation efforts. The remaining items have been withdrawn and are therefore moot. Accordingly, partial summary judgment is not warranted, and request (B) is DENIED.

Third, in request (C), Defendant seeks to exclude "claimed damages that amount to betterments of certain areas of the premises outside of the PSA." [Doc. No. 137-1 at 1]. As examples, Defendant identifies Plaintiff's claims for storm doors, storm windows, copper gutters, and alarm system improvements. [*Id.* at 5]. Defendant contends that, by selecting higher-cost items—such as more expensive storm doors and windows or copper gutters instead of aluminum—Plaintiff is seeking damages beyond the scope of the PSA. [*Id.* at 9]. Plaintiff disputes this argument on multiple grounds. [Doc. No. 145 at 10]. First, Plaintiff maintains that, even if some items could be characterized as betterments, that characterization does not preclude recovery altogether, as Plaintiff is still entitled to recover the reasonable costs of remediation. [*Id.*]. Second, Plaintiff argues that Defendant misstates the underlying facts, pointing to Defendant's alleged failure to install gutters and its use of unsuitable windows for an oceanfront property. [*Id.*]. Plaintiff further cites evidence that it was forced to install plexiglass over the windows to mitigate ongoing water intrusion. [*Id.*]; *see also* [Doc. No. 146-13 at 2]. In light of these disputes, and because distinguishing between recoverable remediation costs and non-recoverable betterments is a question for a jury, summary judgment is not appropriate on this issue. Accordingly, request (C) is DENIED.

Finally, in request (D), Defendant seeks to preclude Plaintiff from recovering damages related to the retention of consultants and experts. [Doc. No. 137-3 at 1]. In support, Defendant relies on 28 U.S.C. § 1920 and Fed. R. Civ. P. 54, along with two cited cases, and argues that

Plaintiff's second supplemental disclosures improperly include $79,197.71 for such costs, which are not recoverable as a matter of law. [*Id.* at 10]. This argument misconstrues the procedural posture of the case. Section 1920 governs the taxation of costs, including "[c]ompensation of court appointed experts," and Rule 54(d)(1) addresses costs other than attorney's fees—not substantive damages for remediation. Moreover, as Plaintiff correctly notes, the cases cited by Defendant concern expert witness fees, not the costs of professionals retained to address or remediate property damage. [Doc. No. 145 at 11]. Indeed, Plaintiff represents that it "has not requested expert fees or expert witness fees." [*Id.*]. To the extent Plaintiff later seeks to recover expert witness fees, Defendant may renew its argument at the appropriate time. At present, however, the issue is premature. Accordingly, Defendant's motion for partial summary judgment as to request (D) is DENIED.

### E.    171 Atlantic's Second Motion for Partial Summary Judgment

In their second motion for partial summary judgment, Defendant seeks to preclude Plaintiff from recovering damages for alleged construction defects that (A) fall outside the scope of the PSA, (B) constitute consequential damages purportedly excluded by the PSA, and/or (C) lack support from necessary expert testimony. [Doc. No. 172 at 1]. I decline to grant that request.

Specifically, Defendant identifies 35 categories of damages as falling within request (A)— those purportedly "aris[ing] outside of the [PSA]." [Doc. No. 172-1 at 8–9]. Many of these categories have already been addressed *supra*, either as presenting genuine disputes of material fact or as supported by undisputed evidence of Defendant's breach of contract, and others have since been withdrawn.

28

The following categories of damages identified by Defendant in this motion, [Doc. No. 172-1 at 8–9], have been withdrawn by Plaintiff. Accordingly, Defendant's request for partial summary judgment as to those categories is DENIED as moot.

- "Electrical Grounding"

- "Open Cell Insulation"

- "Replace Window & Door MDF Trim"

- "Replace Crown & Coffered Ceiling MDF Trim"

- "Replace Baseboard MDF Trim"

- "Replace MDF Cottage Paneling & Trim"

- "Replace MDF Doors"

[Doc. No. 196 at 1]; [Doc. No. 185-1 at 22].

The following categories of damages arise from Defendant's violations of the MBC, discussed in Sec. IV.A., *supra*, as evidence of a breach of contract. Accordingly, I will not preclude Plaintiff from seeking damages for these categories, as I have already found sufficient evidence to grant partial summary judgment to Plaintiff on liability for those violations.[3] These include:

- "Inadequate side lap of wall wood shingles"

- "Replace Exterior Ceder Siding and Trim"

- "Replace Asphalt Shingles"

- "Air/Weather Barrier (AWB) not sealed to abutting stone"

- "AWB missing at wood sheathing and blocking in several locations"

---

[3] Some of these building code violations concern the roof, including issues such as exposed nail heads in the asphalt shingles and the need to replace those shingles. As discussed in Sec. IV.B, *supra*, there is a genuine dispute of material fact regarding the roof under the express warranty. Accordingly, Plaintiff may pursue damages related to the roof under the breach of contract claim, but not under the breach of express warranty claim. The latter issue must proceed to trial to determine whether Defendant breached the express warranty as to the roof.

- "Reverse lap of vertical flashing leg to wall AWB was observed at several areas above horizonal trim"

- "Reverse lap of vertical flashing leg was observed at deck to wall transitions at the second floor balcony above the front entrance and along the second floor rear balcony"

- "No sheathing or AWB was observed at top of wall at the eave soffit"

- "Wall mounted lights were observed with improper seal"

- "Spray Polyurethane Foam (SPF) is exposed in third floor bedroom closet and in the attic. No thermal or ignition barrier is placed over the SPF. Further, the SPF is classified as 'open cell' with no interior vapor retarder and no apparent roof venting"

- "Remove and replace all open cell spray foam insulation"

- "Exposed paper facing on batt ceiling insulation in basement"

- "Many asphalt roof shingles have exposed nail heads at apron locations"

- "Roof architectural, asphalt shingles were observed woven, not closed-cut in valleys per the manufacturer's requirements"

- "Sewer manhole cover is elevated above the finished grade"

- "Water collection panels under the rear deck direct water toward the building"

- "Replace Deck Metal Panel System"

- "Macerator & Site Grading Remediation"

- "Retaining Wall"

- "Energy Analysis"

[Doc. No. 172-1 at 8–9].

Defendant raises, for the first time in its reply in support of its second motion for partial summary judgment, a challenge to the alleged building code violations. [Doc. No. 189 at 2–4, ¶¶ 4–6]. The proper time to raise such arguments, however, was in response to Plaintiff's motion for

partial summary judgment. [Doc. No. 166]. Defendant's failure to do so constitutes waiver. *See Latimore v. Trotman*, 2021 WL 5763009, at *1 (D. Mass. Dec. 3, 2021) (citing *NEPSK, Inc. v. Town of Houlton*, 283 F.3d 1, 7–8 (1st Cir. 2002)) ("When a party fails to file a timely opposition, a court may consider the motion unopposed or the opposition waived and allow the motion."). Accordingly, I decline to consider Defendant's belated argument.

The remaining categories of damages that Defendant seeks to preclude as outside the scope of the PSA are:

- "1st Floor/Great Room"

- "Christian D. Landscaping / Hydrolite Landscape Lighting & Irrigation"

- "101 Mobility"

- "Wayne Alarm System"

- "Elevator Life Safety"

- "Structural Evaluation"

- "Property Survey"

[Doc. No. 172-1 at 8–9].

Defendant contends that these categories fall outside the express terms of the Punchlist and the Seller's Limited Warranty. *See* [Doc. No. 172-1 at 8]. Plaintiff, however, points to contrary evidence. *See* [Doc. No. 185-1 at 20–22]. In particular, Plaintiff relies on the Seller's Limited Warranty, deposition testimony, and other record evidence to support its claims for damages on these seven line items. [*Id*.]. For example, with respect to the "Elevator Life System," Plaintiff cites the Limited Warranty provision covering the electrical wiring system, including receptacles and switches, and references Berman's testimony that a safety switch is necessary because, "[i]f the electricity goes off in the elevator, it doesn't go anywhere. You're stuck." [Doc. No. 185-1 at

31

21]; [Doc. No. 185-13 at 14; Berman Dep. 646:1–10]. In light of this record, I find that genuine disputes of material fact exist as to these categories of damages. Those disputes are better suited for a jury in determining whether damages are warranted. Accordingly, Defendant's request is DENIED.

Next, in its second sub-request, Defendant seeks to preclude Plaintiff from recovering damages that "B) constitute consequential damages which are specifically excluded by the PSA." [Doc. No. 172 at 1]. Most of the challenged categories have since been withdrawn by Plaintiff, *see* [Doc. Nos. 194 and 196], and I do not repeat them here; those requests are DENIED as moot. The remaining categories that Defendant characterizes as consequential, and that Plaintiff has not withdrawn, are as follows:[4]

- "Structural Evaluation"

- "Energy Analysis"

- "Property Survey"

- "Melanson Water Utility Usage"

- "Home Assessment Consultant"

[Doc. No. 194 at 2–3]; [Doc. No. 172-1 at 9–10].

I have already denied Defendant's request to exclude the Structural Evaluation, Energy Analysis, and Property Survey in addressing sub-request (A), *supra*, and therefore do not revisit those items here. With respect to the "Melanson Water Utility Usage" and "Home Assessment Consultant" line items, Defendant argues that these constitute consequential damages because they extend beyond the Seller's Limited Warranty, which "specifically excludes any consequential and

---

[4] This list excludes the "Affinity Custom Homes & Renovations" and "Irrigation Metering/Sewer Charges" line items because, as of February 13, 2026, Defendant no longer characterizes those damages as consequential. *See* [Doc. No. 194 at 2].

incidental damages and is limited only to dwelling repairs." [Doc. No. 172-1 at 14 (quoting Seller's Limited Warranty)]. Plaintiff responds that Defendant used Plaintiff's utilities "for construction-related purposes" from June 1, 2021, through October 1, 2021. [Doc. No. 185-1 at 24 (citing [Doc. No. 185-4, Ex. 11, 2021–2024 Utility Billing])]. Plaintiff further states that it retained a commercial consulting group to inspect the Property because, among other reasons, the Property "failed to provide a reliable habitable environment." [Doc. No. 185-1 at 25]; [Doc. No. 146-9 at 3]. According to Plaintiff, this assessment was necessary to determine the scope of remediation required. [Doc. No. 185-1 at 26].

Consequential damages are defined as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act." [Doc. No. 172-1 at 14 (quoting *Black's Law Dictionary* (9th ed. 2009))]. Under Massachusetts law, parties may "limit or exclude consequential damages unless the limitation or exclusion is unconscionable." *Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 377 (D. Mass. 1991). Here, although the PSA purports to waive consequential damages, the contract is not the exclusive avenue for recovery. As discussed in Sec. IV.C, *supra*, I have found Defendant liable under the implied warranty of habitability, which cannot be waived. Plaintiff represents that it retained the home assessment consultant because the Property did not provide a "reliable habitable environment." [Doc. No. 146-9 at 3]. On this record, I decline to preclude Plaintiff from seeking damages for the "Home Assessment Consultant."

Further, to the extent the "Melanson Water Utility Usage" includes improperly billed charges, I likewise decline to preclude recovery of those damages. The parties dispute whether Defendant billed Plaintiff for utilities used for construction-related purposes, and that factual

dispute cannot be resolved on the present record. [Doc. No. 185-1 at 24]; [Doc. No. 185-4 (Ex. 11, 2021-2024 Utility Billing)].

Accordingly, Defendant's request to preclude Plaintiff from recovering the categories of damages it characterizes as consequential is DENIED.

Finally, in its third sub-request, Defendant seeks to preclude Plaintiff from pursuing damages that "C) are unsupported by necessary expert opinion." [Doc. No. 172 at 1]. Defendant contends that expert testimony is required to recover for the following categories of damages:[5]

- "Crawl Space Insulation & Barriers"

- "Moisture Mitigation Equipment"

- "Radon Equipment"

- "[Moisture and Radon Remediation] Overhead"

- "Storm Doors (6 Openings)"

- "Storm Windows (Oceanfront)"

- "[Storm Doors and Windows] Overhead"

- "Stone Basement Wall Remediation"

- "Stone Chimney Reconstruction Above Roofline"

- "Basement Floor Recoating & Radon Detection"

- "Additional Radon Mitigation"

- "Jaison Pizoni Painting"

- "Attorney's Fees and Costs"

---

[5] I do not repeat the categories of damages already addressed, even where Defendant has placed them in multiple subcategories. Having declined to preclude recovery as to those items, I do not revisit them here.

34

In support of this argument, Defendant asserts that "[o]n questions of causation and technical issues, expert guidance is essential to prevent a jury from having to resort to impermissible 'conjecture and surmise.'" [Doc. No. 172-1 at 16 (quoting *Esturban v. Massachusetts Bay Transp. Authority*, 68 Mass. App. Ct. 911 (Mass. App. Ct. 2007)]. While that proposition is correct, it is not dispositive at this stage. This case is presently at summary judgment, not trial. Although Plaintiff may ultimately need expert testimony to prove certain categories of damages, that determination is premature. Defendant cites no authority from a comparable procedural posture requiring the exclusion of damages at summary judgment based on the absence of expert opinion. I decline to impose such a requirement here.

Accordingly, Defendant's second motion for partial summary judgment is DENIED.

## V.    CONCLUSION

For the reasons explained, RMB's motion for partial summary judgment, [Doc. No. 166], is <u>GRANTED in part</u> and <u>DENIED in part</u>, and 171 Atlantic's first and second motions for partial summary judgment, [Doc. Nos. 137 and 172], are <u>DENIED</u>.


SO ORDERED.

/s/ Myong J. Joun
United States District Judge